# In the United States Court of Federal Claims

**FOR PUBLICATION**

No. 23-1754C
(April 2, 2024*)

|  |  |
|---|---|
| **CLEAN TEAM JANITORIAL SERVICE, INC.**, | ) ) ) ) |
| *Plaintiff,* | ) ) ) |
| v. | ) ) ) |
| **UNITED STATES**, | ) ) ) |
| *Defendant,* | ) ) ) ) |

*Aron C. Beezley*, Bradley Arant Boult Cummings LLP, Washington, DC, for plaintiff. With him on the briefs were *Nathaniel J. Greeson* and *Gabrielle A. Spiro*, Bradley Arant Boult Cummings LLP, Washington, DC.

*Matthew J. Carhart*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant. With him on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Patricia M. McCarthy*, Director, and *William J. Grimaldi*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC. *Jessica Chen*, *Nicole Hutchinson*, and *Teresa Saunders*, Attorneys, U.S. Secret Service, *Of Counsel*.

### OPINION AND ORDER

**BONILLA, Judge**.

---

* This Opinion and Order was originally filed under seal on March 22, 2024, in accordance with the protective order entered in this case. The Court provided the parties an opportunity to review the decision for any proprietary, confidential, or other protected information and submit proposed redactions. On March 29, 2024, the parties jointly proposed two limited and justified redactions, seeking to cloak the identities of a government official accused of misconduct and a proffered witness. The Court adopts the parties' joint proposal and reissues the decision using the government employee's initials "[A.M.]" and redacting the witness's name.

This post-award bid protest involves a follow-on janitorial services contract for a federal law enforcement training facility. The incumbent contractor principally charges the agency failed to properly investigate reported violations of the Procurement Integrity Act (PIA), 41 U.S.C. § 423. Challenging the agency's Independent Government Cost Estimate (IGCE) calculation, the incumbent further maintains the Small Business Administration (SBA) 8(a) set aside contract should have been competitively bid. This suit serves as the fourth post-award bid protest filed by the incumbent relating to this janitorial services contract, the agency opting to take corrective action during the prior actions filed before the Government Accountability Office (GAO).

Pending before the Court are plaintiff's motion for judgment on the administrative record (ECF 24) and defendant's cross-motion to dismiss and for judgment on the administrative record (ECF 27). For the reasons stated below, plaintiff's dispositive motion is DENIED and defendant's dispositive cross-motion is DENIED-IN-PART (motion to dismiss) and GRANTED-IN-PART (motion for judgment on the administrative record).[1]

## BACKGROUND

### I. Incumbent Contractor

Clean Team Janitorial Service, Inc. (Clean Team) is a privately held, minority-owned janitorial services company in the Washington, DC metropolitan area. Since 1997, the company has offered a range of long-term contract and on-demand cleaning services to federal and state government offices, commercial businesses, medical facilities, and national parks. Among its licenses and credentials, Clean Team is a certified SBA 8(a) program participant.

On September 28, 2017, the United States Secret Service (Secret Service) awarded Clean Team a five-year janitorial services contract to maintain the James J. Rowley Training Center (JJRTC), located in South Laurel, Maryland. The SBA 8(a) sole source set aside contract was valued at $3.54 million.[2] Shortly before the contract's September 27, 2022 expiration, in accordance with Federal Acquisition Regulation (FAR) 7.102 (Acquisition Planning Policy) and 10.001 (Market Research Policy), Contracting Officer's Representative (COR) [A.M.],[3] Contracting Specialist

---

[1] In resolving the dispositive cross-motions addressed herein based upon the parties' briefs, the Court necessarily grants plaintiff's motion to waive oral argument (ECF 31).

[2] The SBA assists firms owned and controlled by socially and economically disadvantaged individuals by ensuring participants have equitable access to contracting opportunities in the federal marketplace.

[3] Throughout the administrative record, although only employed by the Secret Service for about three months at the time of the critical events discussed, [A.M.] is referred to in various roles, including "Project Engineer," "Contracting Officer's Technical Representative (COTR)," and "Contracting Officer's Representative (COR)." For clarity, the Court uniformly uses [A.M.'s] official role on the Clean Team contract: "COR."

2

(CS) Sara Strange, and Small Business Specialist Kimberly Witcher prepared a Market Research Report for the follow-on procurement.[4] The August 1, 2022 report concluded, in sum and substance, "that adequate competition can be achieved through small business set aside procurement." AR 79.[5]

On August 9, 2022, counsel for Clean Team penned a letter to Contracting Officer (CO) Theresa Williams, wherein the incumbent contractor raised "concerning, unethical, and potentially criminal actions by an individual on [the agency's] contracting staff." AR 1. Clean Team summarized the "inappropriate interactions and conversations" between COR [A.M.] and members of the Clean Team janitorial staff as follows:

1. During the week of May 30th, 2022, the Clean Team Contract Supervisor, [███], was exiting the Hazen building at the JJRTC when she was approached by [COR A.M.]. [COR A.M.] did not introduce himself but proceeded to ask [███] how many employees Clean Team had on site.

    [███] asked [COR A.M.] why he needed that information, to which he responded that he "needed to provide it to the new company."

2. [COR A.M.] requested that [███] meet with him at his office. During the meeting on May 31[st], 2022, [COR A.M.] proceeded to ask questions regarding Clean Team Staff and informed [███] that there was a "new company taking over the contract."

3. On June 2nd, 2022, [███] was having lunch when [COR A.M.] approached her again asking her to tell him what her salary was. [███] did not feel comfortable disclosing that information and declined to tell him. [COR A.M.] left and returned immediately thereafter with a piece of paper that he informed [███] was "part of a new contract" that [COR A.M.] was preparing for a new company. [COR A.M.] then presented [███] with a number on a piece of paper and asked [███] if the number was close to her salary. [███], still uncomfortable, responded, "something like that."

4. Later in the day, on June 2nd, 2022, [███] went to [COR A.M.'s] office to express her discomfort with him requesting her personal information and told [COR A.M.] that she would feel more comfortable if [COR A.M.] would call Clean Team, her employer, to request the necessary information. [COR A.M.] stated that he did not need to contact Clean Team because he could speak with her directly.

---

[4] A follow-on procurement is a new contract for the same or nearly identical services. *See* 13 C.F.R. § 124.3 (definition of "[f]ollow-on requirement or contract").

[5] "AR __" cites to a Bates numbered page in the administrative record.

5. The week of July 4th, 2022, [COR A.M.] approached the remaining Clean Team staff members informing them that he was Mr. Laurens' (the former COTR) replacement, and proceeded to request their salary information.

6. Over the following weeks there have been several inappropriate conversations initiated by [Secret Service] engineering staff with Clean Team staff members regarding contract matters, including telling [▆▆▆▆] that she should not be concerned and that it was only her changing company uniforms. [COR A.M.] has continued to represent to [▆▆▆▆] that he does not need to contact Clean Team because she is the person who "runs the contract" and has the information regarding Clean Team staff and their salaries that he needs to "move forward."

AR 1–3.[6]  In reporting the alleged PIA violations,[7] Clean Team requested that the contracting officer investigate the reported conduct and, in doing so, consider whether to refer the matter to the appropriate Office of Inspector General.  Expressing concern regarding the impending follow-on contract, Clean Team sought COR [A.M.'s] recusal and a suspension of any award until the PIA investigation was completed.

Two days later, on Thursday, August 11, 2022, CS Strange emailed COR [A.M.] and relayed:

> The CO has decided to change the acquisition strategy of this procurement. We will now be going sole source to an 8(a). If the current contractor can perform the work that will be the way to propose we go.
>
> Can you please update the market research to reflect the use of the 8(a) company, Clean Team Janitorial[?] If you do not want to use them please propose we use a different company and why.

AR 102.  Clearly aware of Clean Team's recent allegations, COR [A.M.] responded by recusing himself from the matter: "I want to be recused from this process.  Clean Team has just made a series [of] false allegations against me. Let someone else make whatever decision, but please don't get me involved. Thank you." *Id.*

---

[6] Clean Team's counsel also summarized the law and policy relevant to the alleged PIA violations, particularly the difference between "cost or pricing data" and "salary data" and the legal implications for collecting the latter. AR 4.

[7] As discussed *infra*, the PIA addresses the unauthorized securing and disclosure of confidential and proprietary procurement information, engaging certain government officials in private sector employment discussions, and the cooling-off period for former government officials following their separation or retirement. *See* 41 U.S.C. § 423.

The next day, Secret Service Deputy Special Agent in Charge (DSAIC) Mark C. Switzer, of the Office of Enterprise Readiness, Procurement Division (OER-PD), opened an internal investigation. COR [A.M.] was interviewed four days later. During his August 16, 2022 interview, as documented in DSAIC Switzer's Directorate-Based Fact-Finding Report dated August 23, 2022, COR [A.M.] "admitted to inquiring with [____], an employee of Clean Team, regarding her employment salary" and advising [____] that "he was working on the paperwork for a new contract, and she should 'tell her folks to start getting ready to bid for it.'" AR 11. COR [A.M.] explained to the Secret Service agents he was conducting market research to prepare the Performance Work Statement (PWS) and calculate the IGCE for the follow-on procurement similar to how he gathered data months earlier in his former role with the Federal Emergency Management Agency. When asked, COR [A.M.] emphatically denied engaging [____] more than once or disclosing Clean Team's confidential and proprietary information.[8] In closing the investigation, DSAIC Switzer explained that although COR [A.M.] engaged in "inappropriate" market research, his actions "do not appear to have been for improper actions or contract awards." AR 10–12.

Based on COR [A.M.'s] statements to Secret Service agents, the procurement team–in consultation with the Chief Counsel's Office–decided to remove him as the COR on the current Clean Team contract, but not from his remaining procurement portfolio. He was also directed to undertake refresher training to keep his COR certification. The Office of Training, in turn, referred the allegations of unethical conduct to the Inspection Division.

Between September 21 and October 19, 2022, Secret Service Inspector Mario A. Documet conducted a follow-up investigation into COR [A.M.] alleged ethical lapses. According to the Memorandum of Investigation dated December 21, 2022, during COR [A.M.'s] interview with the Inspection Division, he again "admitted to asking [____] (Clean Team) about her salary and manpower count at [JJ]RTC" and "denied disclosing any proprietary information to Clean Team competitors and denied having any current or previous affiliation with the current [JJ]RTC cleaning company." AR 55. Crediting COR [A.M.'s] representations, the Inspection Division closed the investigation but referred the matter to the Office of Integrity and the Security Management Division for review and appropriate action.[9]

## II. Follow-On Procurement

In the interim, on August 16, 2022, Supervisory Project Engineer (SPE) Kibby M. Powell reached out to several janitorial services companies in search of potential

---

[8] During his OER-PD interview, COR [A.M.] voluntarily provided DSAIC Switzer a copy of his handwritten daily activity log.

[9] The record does not expound upon what action, if any, the Office of Integrity and/or the Security Management Division took.

SBA 8(a) contractors for the JJRTC follow-on procurement.[10]  Relevant here, ICMC Alliance (ICMC) immediately submitted the requested Capability Statement.[11] Thereafter, on August 17, 2022, SPE Powell forwarded ICMC's Capability Statement to CS Strange with the following note: "I have looked at several companies and the attached company has the best qualifications and comparable experience." AR 117.

Later that day, CO Williams requested SBA approval to award ICMC the five-year sole source 8(a) janitorial services follow-on contract, with an anticipated price tag of $3.75 million.  After the SBA failed to substantively respond within the five business day regulatory time period, CO Williams opted to move forward with the solicitation on September 14, 2022.[12]  CS Strange then requested and received ICMC's formal proposal.  On September 27, 2022–the date Clean Team's janitorial services contract expired–the Secret Service awarded the $4.13 million follow-on procurement to ICMC.[13]

On October 7, 2022, January 30, 2023, and July 18, 2023, Clean Team thrice protested the Secret Service's repeated award of the JJRTC janitorial services contract to ICMC before the GAO.  In each instance, Clean Team challenged the sole source nature of the follow-on procurement as well as the completeness of the agency's investigation into the alleged PIA violations.  On October 14, 2022, February 24, 2023, and August 9, 2023, the Secret Service noticed the agency's intent to take voluntary corrective action–including canceling the contract award and resoliciting

---

[10] Despite COR [A.M.'s] August 11, 2022 self-recusal, on August 16, 2016–coincidentally the day of his OER-PD interview and formal removal by the procurement team–SPE Powell asked COR [A.M.] to forward his SBA 8(a) vendor list.  While out of the office, COR [A.M.] forwarded three spreadsheets listing three, nine, and twenty-five "random" vendors–none of which included Clean Team–noting the following: "I will do more searches (8a) [sic] when I get back." AR 1543–46.  As promised, COR [A.M.] followed up about six hours later with a "refined search" listing Clean Team second of the fifty vendors included in the updated spreadsheet.  *See* AR 138–40.  Taken together, the documents in the record do not depict or otherwise evidence the nefarious intent plaintiff ascribes to the initial omission of Clean Team.

[11] ICMC is a minority-owned, multi-discipline consulting joint venture firm based in Beltsville, Maryland, resulting from a strategic partnership between Immersive Concepts, LLC and Magadia Consulting, Inc.  *See* https://perma.cc/2ZHF-RZKA (last visited Mar. 22, 2024).  In response to SPE Powell's email dated August 16, 2022, the Secret Service also received Capability Statements from at least three other janitorial services companies (i.e., B&B Solutions US, LLC, LR-Associates, LLC, and Supereon, LLC).

[12] *See* HSAM Appendix X § IV(A)(4), paragraph 4(a)(i)–(ii) ("SBA will issue either an acceptance letter or rejection letter within five (5) working days of receipt of an offering letter, unless the District Office requests and the procuring activity agree to an extension of time. . . . Absent a notification of rejection within five (5) working days of receipt of the offer, acceptance may be assumed on the sixth (6th) working day unless an extension has been requested and accepted, except for the provision of FAR § 19.808-1 for 8(a) sole source procurements that exceed 20 million.") (emphasis omitted) (available at https://perma.cc/P9GZ-6A7Q (last visited Mar. 22, 2024)).

[13] On September 27, 2022, Clean Team's counsel sent CO Williams a note wherein the company relayed: "It has been brought to our further attention that there is some procurement action occurring in relation to this requirement, but that it was not offered to the incumbent 8(a) contractor, or otherwise competed, as required by FAR 19.805." AR 504.

6

the follow-on procurement–and the GAO protests were dismissed.[14]

Thereafter, on September 15, 2023, the Secret Service awarded the follow-on janitorial services contract to ICMC a fourth time. Clean Team filed the current post-award bid protest in this Court on October 6, 2023. Continuing to challenge the sufficiency of the Secret Service's investigation into the alleged PIA violations, Clean Team also contests the agency's most recent IGCE calculation, asserting that a proper calculation would have exceeded the sole source award ceiling.

## DISCUSSION

### I. Standards of Review

#### A. *Motion to Dismiss*

When considering a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), courts "must accept as true all the factual allegations in the complaint and . . . indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted). "A trial court should not dismiss a complaint for failure to state a claim unless it is beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Id.* (quotation marks omitted) (quoting *Hamlet v. United States*, 873 F.2d 1414 (Fed. Cir. 1989)). Assertions of legal conclusions are not credited during this assessment, and the complaint must include nonconclusory factual allegations setting forth a plausible–as opposed to merely a conceivable–claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 565–66 (2007)).

#### B. *Judgment on the Administrative Record*

RCFC 52.1(c) provides: "a party may move for partial or other judgment on the administrative record." *Id.* The Court of Federal Claims reviews a federal agency's procurement decisions pursuant to the Administrative Procedure Act (APA) standard and must determine whether the agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. 5 U.S.C. § 706(2)(A). The arbitrary and capricious standard is highly deferential and requires this Court to sustain an agency action evincing rational reasoning and consideration of relevant factors. *See Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000); *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed. Cir. 2008).

---

[14] In the interim, on October 31, 2022, ICMC filed an agency-level protest to resolve any questions surrounding the company's SBA 8(a) certification. As discussed *infra*, the issue was ultimately resolved through intervening events.

## II. Procurement Integrity Act

Congress passed the PIA in 1988 in the aftermath of "Operation Illwind"–a three-year federal investigation into procurement fraud within the Department of Defense.[15]  *See* Pub. L. 100-679 § 6(a) (Nov. 19, 1988).  The PIA, as amended, and as implemented by FAR 3.104, prohibits the unauthorized disclosure of "contractor bid or proposal information or source selection information to any person other than a person authorized, in accordance with applicable agency regulations or procedures, by the agency head or the contracting officer to receive such information." FAR 3.104-4(a).  Relevant here, "[c]ontractor bid or proposal information" is defined as "[non-public] information submitted to a Federal agency as part of, or in connection with, a bid or proposal to enter into a Federal agency procurement contract," to include cost or pricing data and indirect costs and direct labor rates.  FAR 3.104-1.[16]  The PIA provides for a variety of criminal and civil penalties and administrative remedies.  *See* 41 U.S.C. § 2105.  In listing the potential administrative actions, the statute defers to the procuring agency to take appropriate action.  *See id.* § 2105(c)(1).

### A. Timeliness[17]

Defendant seeks dismissal of Clean Team's alleged PIA violations on the ground that the company failed to timely report the allegations to the Secret Service. To file a cognizable post-award bid protest alleging PIA violations, a protestor must comply with the following statutory reporting requirements:

---

[15] The investigating agencies included the Federal Bureau of Investigation, the Naval Investigative Service (n/k/a Naval Criminal Investigative Service), the Defense Criminal Intelligence Service, the Air Force Office of Special Investigations, and the Internal Revenue Service's Criminal Division.  As a result of the interagency effort:

> More than 60 contractors, consultants, and government officials were ultimately prosecuted–including a high-ranking Pentagon assistant secretary and a deputy assistant secretary of the Navy.  As a monetary measure of the significance of the crimes, the case resulted in a total of $622 million worth of fines, recoveries, restitutions, and forfeitures.

*See* https://perma.cc/4NLW-6Z2Y (last visited Mar. 22, 2024).

[16] Defendant's argument that [▬▬▬'s] "salary data" does not qualify as "contractor bid or proposal information" is unpersuasive.  *See* 10 U.S.C. § 3701(1) (defining "cost or pricing data" as "all facts that, as of the date of the agreement on the price of a contract . . . a prudent buyer or seller would reasonably expect to affect price negotiations significantly.").

[17] Clean Team argues the Secret Service waived any timeliness defense related to the PIA allegations after the agency took voluntary corrective action in response to the initial GAO protest.  The Court need not decide this issue in light of Clean Team's failure to properly preserve it.  In relegating this contention to a two-sentence footnote–wherein plaintiff first notes the government unsuccessfully raised the timeliness defense in response to a later GAO protest–Clean Team effectively waived its current position.  *See Seventh Dimension, LLC v. United States*, 161 Fed. Cl. 110, 129 (2022) ("Undeveloped or perfunctory arguments, such as those raised in a factual or background section or in the footnotes of a party's brief, may be deemed forfeited or waived.") (citing *SmartGene, Inc. v. Advanced Biological Lab'ys, SA*, 555 F. App'x 950, 954 (Fed. Cir. 2014)).

> A person may not file a protest against the award or proposed award of a Federal agency procurement contract alleging a violation of [the PIA], and the Comptroller General may not consider that allegation in deciding a protest, unless the person, no later than 14 days after the person first discovered the possible violation, reported to the Federal agency responsible for the procurement the information that the person believed constitutes evidence of the offense.

41 U.S.C. § 2106.

Clean Team argues that corporate leadership became aware of the potential PIA violations on July 28, 2022, when members of its JJRTC cleaning staff first reported COR [A.M.'s] inappropriate inquiries. Upon this premise, Clean Team maintains the company's August 9, 2022 reporting of the incidents was timely. The government avers that the fourteen-day clock began to run when the interactions between COR [A.M.] and Clean Team employees actually took place (i.e., between May 30 and July 4, 2022). Even using the last date claimed, the government contends Clean Team reported the allegations well outside the fourteen-day window.

In deciding whether to impute an agent's knowledge to their principal under the theory of vicarious liability, the United States Court of Appeals for the Federal Circuit has instructed: "Corporations act through their employees; the general rule is that an agent's knowledge is imputed to the principal when employees are acting with the scope of their authority or employment, absent special circumstances." *Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348, 1369 (Fed. Cir. 2013) (citing *Meyer v. Holley*, 537 U.S. 280, 285 (2003)). Whatever the reach of vicarious liability, it would be inappropriate to impute to a private employer the random musings or questions a government procurement official directs to an on-site member of the janitorial staff. Aside from the reference to [     ] as a "Clean Team Contract Supervisor" in plaintiff's August 9, 2022 letter–which the Court assumes means janitorial shift supervisor–there is nothing in the record supporting a finding that [     ] possessed any authority (actual or implied) to take official actions on behalf of Clean Team. In fact, COR [A.M.'s] statement to investigators, wherein he shares that [     ] was routinely the only janitor on-site during the dayshift, undermines the conclusion that she was an authorized agent of Clean Team to address contractual matters.

For these reasons, the Court concludes Clean Team discovered the possible PIA violations when [     ] and/or any other member of the JJRTC cleaning crew first shared COR [A.M.'s] inquiries and comments with headquarters. To find otherwise would force companies to owlishly monitor on-site employees at every facility or require daily debriefings to mitigate risk, dramatically increasing contract prices. Viewing the facts of this case in the light most favorable to Clean Team, the motion to dismiss must be denied.

### B. Agency Investigations

Under FAR 3.104-7(a), "[a] contracting officer who receives or obtains information of a violation or possible violation of [the PIA] must determine if the reported violation or possible violation has any impact on the pending award or selection of the contractor." *Id.* Where, as here, the procuring agency formally investigates the claimed PIA violation in making this assessment, "the Court must analyze whether the [a]gency conducted an adequate investigation consistent with the arbitrary and capricious standard of review." *See Oak Grove Techs. LLC, v. United States*, 155 Fed. Cl. 84, 115 (2021) (citing *PAI Corp. v. United States*, 614 F.3d 1347, 1352–53 (Fed. Cir. 2010)). More specifically, "[n]otwithstanding the significant discretion vested in procurement officials, this Court must ascertain whether there exists a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Considering the totality of the circumstances, the independent investigations conducted by the Secret Service were more than sufficient. Two sets of federal law enforcement officials–acting independently of the contracting officer–reviewed Clean Team's PIA allegations and interviewed COR [A.M.] on separate occasions. As memorialized in both investigation reports, COR [A.M.] admitted to having at least one encounter with [       ] wherein he inquired about and confirmed her salary along with the salaries of the general janitorial support staff.[18] Having confirmed the crux of [      's] allegations, the investigating agents reasonably concluded there was no need to interview her. Investigators then took into account COR [A.M.'s] immediate self-recusal from the Clean Team follow-on procurement and the absence of any evidence that COR [A.M.] shared the information he learned from [       ] with ICMC in support of their eventual proposal.[19] Although facially curious, ICMC's post-award September 30, 2022 generic "thank you" email addressed to SPE Powell and naming several Secret Service contracting employees, including COR [A.M.], does not evidence otherwise. *See* AR 1212 ("Kibby, . . . We appreciate all the support in helping

---

[18] Although not relevant to deciding this issue, the irony is not lost on the Court that Clean Team recently agreed to "pay more than $260,000 to janitorial workers and the District [of Columbia] to resolve allegations that the company underpaid workers from 2020 to 2023" in violation of the Service Contract Act (SCA), 41 U.S.C. § 351, *et seq. See* https://perma.cc/57V2-MHUJ (last visited Mar. 22, 2024). The Court takes judicial notice of the settlement agreement appended to the press release issued by the Office of the Attorney General for the District of Columbia on January 26, 2024. *See Cyntec Co. v. Chilisin Elecs. Corp.*, 84 F.4th 979, 989 n.6 (Fed. Cir. 2023) (citing case).

[19] The Court rejects Clean Team's criticism regarding the investigating agents' acceptance of ICMC outside counsel's representation that COR [A.M.] did not share Clean Team's confidential or proprietary information. The record documents the investigating agents' review of certain internal emails to and from COR [A.M.] as well as COR [A.M.'s] handwritten daily activity log dating back to April 2022. Moreover, at the time of COR [A.M.'s] alleged interactions with [       ], and continuing through his August 11, 2022 self-recusal and August 16, 2022 investigative interview, ICMC was not even aware of the follow-on procurement, let alone in contact with Secret Service contracting officials. Put simply, a forensic search of COR [A.M.'s] emails and computer files and/or interviews of ICMC personnel was not required.

us transition the team in over this week. The communication and response from you, Mark, Aamir and [A.M.] has been great."). One could indeed argue that if COR [A.M.] conspired with or otherwise aided and abetted ICMC, the company would not go out of its way to call attention to their nefarious relationship or engagement. Accordingly, there is no basis in law or in fact to find the independent investigations conducted by the Secret Service were inadequate.

### III.  Competitive Threshold

Under applicable SBA's regulations, "[a] procuring activity contracting officer indicates his or her formal intent to award a procurement requirement as an 8(a) contract by submitting a written offering letter to SBA." 13 C.F.R. § 124.502(a). This requirement applies whether the anticipated procurement is new or a follow-on 8(a) contract. *Id.* § 124.502(a)(1).

> Where [the] SBA decides to accept an offering of a sole source 8(a) procurement, [the] SBA will accept the offer both on behalf of the 8(a) [Business Development] program and in support of a specific [p]articipant. As part of its acceptance of a sole source requirement, [the] SBA will determine the eligibility of the [p]articipant identified in the offering letter, using the same analysis set forth in § 124.501(g).

13 C.F.R. § 124.503(a)(1).  Relevant to Clean Team's bid protest, when the anticipated award price of a contract (including all options) exceeds $4.5 million, the procurement must be competed among eligible 8(a) participants. *Id.* § 124.506(a)(2) & (3); *accord* FAR 19.805-1(a).

Clean Team charges the Secret Service manipulated its IGCE to circumvent the regulatory competition requirement. Specifically, Clean Team asserts the agency's IGCE does not reflect the level of effort specified in the PWS and fails to account for the minimum wage rates required by law. Clean Team further challenges ICMC's status as an SBA 8(a) participant. These issues are addressed seriatim.

Regarding the Project Manager and Secretary I roles, Clean Team notes the clear disconnect in the IGCE, which specifies one full-time employee (FTE) for each position yet calculates the cost of each role using 208 annual hours. Rather than the typical forty-hour work week for each FTE (40 hours x 52 weeks = 2,080 hours per year), Clean Team explains the Secret Service allots only four hours per week for each supposed *full-time* role (208 annual hours ÷ 52 weeks = 4 hours per week). Whatever the hourly rate, Clean Team contends the additional 3,744 hours per year for both roles (or 18,720 total additional hours over the life of the five-year janitorial services contract) would increase the anticipated award price of the contract well above the $4.5 million threshold for mandatory competition.

Defendant readily concedes the inconsistency and represents that the "1" FTE listed for the Project Manager and Secretary I roles is a typographical error and

11

should have read "0.1" FTE to correspond with the allotted 208 hours per year for each role. This concession of ministerial error is consistent with the two positions listed directly below these two roles. The Supervisory Janitor role similarly lists one FTE but calculates the cost of this role using the typical 2,080 hours per year. The IGCE then lists ten FTEs each working 2,080 hours per year as janitors. Given the nature of this procurement, it is reasonable to employ a full-time (forty hours per week) janitorial supervisor to manage ten full-time janitors; an additional full-time project manager and secretary is excessive.

To that end, Section 8.1.2 of the PWS describes the role of Project Manager in relevant part:

> The Project Manager shall have the full authority to act on matters pertaining to the performance of services. Be on-site *or on-call* whenever work is being performed and submit a Quality Control Plan for [Secret Service] Facilities Management's approval. Report damage to Government property, loss of keys, personal injuries and/or hazardous conditions to the [Secret Service] Facilities Management within twelve work hours after occurrence.

AR 745 (emphasis added). The Project Manager's flexibility to be "on call" rather than on-site undermines Clean Team's contention that the PWS required a forty-hour work week commitment. Specifically, by regulation:

> An employee will be considered off duty *and time spent in an on-call status shall not be considered hours of work* if:
>
> (1) The employee is allowed to leave a telephone number or to carry an electronic device for the purpose of being contacted, even though the employee is required to remain within a reasonable call-back radius; or
>
> (2) The employee is allowed to make arrangements such that any work which may arise during the on-call period will be performed by another person.

5 C.F.R. § 551.431(b) (emphasis added).

Nor does Clean Team's interpretation account for the Level of Staffing provision included in the PWS. Section 8.2 requires only one supervisor or worker and one contract employee during the day shift and an additional three contract employees for the night shift. There is no requirement the Project Manager or the Secretary I be physically present during either shift. Combined with a plain reading of Section 8.2, the Secret Service's interpretation of these provisions is also entitled to deference. *See Tyler Constr. Grp. v. United States*, 570 F.3d 1329, 1334 (Fed. Cir. 2009) ("[F]ederal procurement entities . . . [have] broad discretion to determine what

particular method of procurement will be in the best interests of the United States in a particular situation.") (citing cases).

Turning to the hourly rates, consistent with 48 C.F.R. § 52.222-55 (Minimum Wages for Contractor Workers Under Executive Order 14026), defendant readily concedes: "Clean Team is correct that the hourly rate for Secretary I should have been $20.87, not $20.31, and the hourly rate for janitor should have been $16.87, not $15.64." ECF 27 at 26. Proffering a recalculated IGCE–using the increased hourly wages and the now-confirmed hours across the life of the five-year contract– the net increase to the IGCE is $264,673.98, raising the anticipated award price of the contract to $4,272,844.31. *Compare* AR 673 *with* ECF 27 at 26–27. Because the adjusted amount remains below the $4.5 million threshold, the Secret Service was not required to conduct a competitive follow-on procurement.

In sum, despite the ministerial errors and necessary corrections to the IGCE, the Secret Service reasonably concluded that the anticipated contract award would fall below the regulatory threshold requiring competitive bidding. *See, e.g., Anderson Consulting Co. v. United States*, 959 F.2d 929, 932 (Fed. Cir. 1992) ("[O]verturning awards on de minimis errors wastes resources and time, and is needlessly disruptive of procurement activities and governmental programs and operations."), *quoted in Grumman Data Sys. Corp. v. Widnall*, 15 F.3d 1044, 1048 (Fed. Cir. 1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement.") (citing *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 960 (Fed. Cir. 1993)). It is also important to note that the actual contract price of the Clean Team legacy contract–as well as each iteration of the janitorial services follow-on contract awarded to ICMC–was below $4.5 million. As such, there is no basis in law or fact to find the Secret Service artificially lowered the anticipated value of this procurement to place the requirement in the SBA 8(a) program while sidestepping the regulatory-mandated competitive threshold.

Finally, Clean Team charges "ICMC falsely represented itself as an 8(a) certified joint venture" at the time of the initial September 27, 2022 award of the follow-on procurement. ECF 24 at 37. As explained *supra*, prior to this action, the Secret Service's award to ICMC was the subject of a series of GAO protests. Each time, the agency noticed its intent to take corrective action and, thereafter, canceled the procurement and (re)awarded the contract to ICMC. By the time the Secret Service made the fourth award to ICMC nearly a year later, on September 15, 2023, there was no lingering issue with respect to the company's SBA 8(a) certification. Contrary to Clean Team's argument, to the extent ICMC's status was in question before, it was resolved in time for the contract award at issue in this bid protest. Rather than carry forward, the challenge has been overcome by events and is, therefore, moot. *See, e.g., Eskridge Rsch. Corp. v. United States*, 92 Fed. Cl. 88, 94 (2010) ("It is well established that '[w]hen, during the course of litigation, it develops that . . . the questions originally in controversy between the parties are no longer at issue, the case should generally be dismissed.'") (quoting *Chapman Law Firm Co. v.*

*Greenleaf Constr. Co.*, 490 F.3d 934, 939 (Fed. Cir. 2007)).[20]

## IV. Permanent Injunctive Relief

To grant injunctive relief, the Court must consider whether: (1) plaintiff has succeeded on the merits of the case; (2) plaintiff will suffer irreparable harm if the Court withholds injunctive relief; (3) the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) the public interest is served by granting injunctive relief. *See GS4 Secure Integration LLC v. United States*, 161 Fed. Cl. 387, 418 (2022) (citing *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)). As the party seeking injunctive relief, Clean Team bears the burden of proof. *Dell Fed. Sys. L.P. v. United States*, 906 F.3d 982, 999 n.13 (Fed. Cir. 2018).

### A. Likelihood of Success

Success on the merits carries "great weight" in determining whether injunctive relief is appropriate. *Id.* It necessarily follows that a protestor's inability to make this showing "precludes the possibility of an injunction." *Id.*; *accord Aircraft Charter Sols., Inc. v. United States*, 109 Fed. Cl. 398, 416 (2013) ("[W]ithout success on the merits, the injunctive relief inquiry is over."). Finding in favor of the Secret Service on the merits of this case, the Court necessarily concludes Clean Team has not succeeded on the merits, thereby failing to meet its burden under this factor.

### B. Irreparable Harm

Clean Team argues it will suffer irreparable harm to its business absent injunctive relief. In support, Clean Team cites to the deprivation of its opportunity to compete for a follow-on procurement as the incumbent contractor. At best, the claimed harm is attenuated because Clean Team cannot demonstrate a substantial likelihood it would have been selected for award. On the contrary, the alleged PIA violations are premised on the Secret Service looking to go in another direction. Therefore, Clean Team cannot show the requisite irreparable harm.

### C. Balance of Hardships

The balance of hardships does not tip in Clean Team's favor. Clean Team argues the Secret Service will not suffer harm if it cannot proceed with an arbitrary and otherwise unlawful contract award, but fails to demonstrate the agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. In fact, the balance of hardships leans heavily in favor of the government–allowing the

---

[20] Clean Team separately claims it was prejudiced by the cumulative effect of the various procurement errors alleged. This contention is inextricably intertwined with the issues resolved herein in favor of the procuring agency. Accordingly, the Court finds that the whole fares no better than the sum of its parts.

14

Secret Service to continue with this procurement will finally allow ICMC to provide janitorial services at the JJRTC.

### D. Public Interest

This Court has held "the public has a strong interest in a fair and competitive procurement process, which is best served by ensuring that the government complies with regulations governing procurement programs." *KVW, Inc. v. United States*, 111 Fed. Cl. 119, 128 (2013) (citations omitted). The Court finds the Secret Service acted reasonably and complied with applicable law. The public interest would not be served by an injunction disturbing the agency's determinations. Accordingly, the Court denies plaintiff's request for permanent injunctive relief.

## CONCLUSION

For the foregoing reasons, plaintiff's motion to waive oral argument (ECF 31) is **GRANTED**, plaintiff's motion for judgment on the administrative record (ECF 24) is **DENIED**, and defendant's cross-motion to dismiss and for judgment on the administrative record (ECF 27) is **DENIED-IN-PART** and **GRANTED-IN-PART** in that the motion to dismiss is **DENIED** and the motion for judgment on the administrative record is **GRANTED**. The Clerk of Court is directed to **ENTER Judgment** accordingly. No costs.

It is so **ORDERED**.

Armando O. Bonilla
Judge